Good morning, Your Honors. Theodore J. Boutrous, Jr., representing Safeco. I'd like to reserve three minutes for rebuttal. The trial that took place in this case between the FDIC as receiver for NetBank and Safeco was focused largely on a single issue, whether Safeco was fraudulently induced to issue bonds by and participate in the Commercial Money Center lease pool, lease bond program. The jury answered that question, no. It rejected Safeco's argument on that issue and returned a verdict for about $60 million. The trial record here reveals that the district court made two fundamental errors that go right to that fraudulent inducement issue that require a new trial. They were deeply prejudicial errors that skewed the jury's analysis of the record. The first one really couldn't be more fundamental. As the Court will recall from the briefs, the agent who worked for CMC, which is the alleged fraudster here and was running this program, was named Michael Anthony. And he's the person who solicited Safeco to write the bonds and issue the bonds. He also had a limited agency authority for Safeco to sign the bonds, but he had no authority to do anything other than do that. He couldn't approve them. He couldn't independently take on risk. He had very limited authority. Kennedy, but it was these bonds that he had authority to sign once he was told to go ahead and sign it, right? Correct. It wasn't some entirely separate transaction. That's right, Your Honor. It's not like he's somebody who's working for the company on auto policies and suddenly there's this life insurance policy that comes up. He has knowledge about the person, but that's not his deal. Exactly. So this is his deal. Why isn't this within the scope of his authority? Well, the cases in California are very clear on this, that you have to look very closely at the limits on the authority, and some agents would have had authority potentially to assess the risk, take on risk independently, withhold information from the company, make judgments themselves. No, because agency principle responsibility generally, agents' authority is generally not unlimited. They don't automatically speak for the principle, and yet the agent is acting at the behest of the principle, and the principle is customarily expected to inquire of its agent knows, and that's why the agent's information is imputed to the principle. I'm not sure how this is any different. It's very different, Your Honor. Imagine this. Mr. Anthony wasn't someone who was Safeco's regular employee or regular agent. He didn't have a Safeco jacket and hat on. He worked for CMC, which Safeco alleged committed the fraud. Which would just seem to suggest that Safeco really ought to ask him what he knows. They did, Your Honor. Safeco asked him what he knew about the principles, and he did not disclose. And this is the heart of the claim. He did not disclose that he knew that both principles had suffered personal bankruptcies. One had been banned by the SEC for life from participating in particular securities transactions. They had very checkered pass, and he should have told them that. He had no authority to conceal that from the company. He had no authority to make judgments at all about whether to issue the bonds. And it's about the most perverse situation one could imagine. And we're just asking to have the jury consider this. I'm obviously not asking the Court to rule on the merits here. But to have a person who was aligned with, who set up the program, who induced and solicited the company to come into the program, who, when asked point blank, what do you know about these individuals, concealed that he knew they had very checkered pass, that his knowledge is imputed to the company, flies in the face of Hornbook agency law. And that issue was crucial, because, as we pointed out, the FDIC's trial counsel read the instruction to the jury. I mean, this just crippled the defense, fraudulent inducement. It said everything that he knew was imputed to Safeco. So Safeco knew everything, so its fraudulent inducement claim is out the window. And he answered it. Scalia, did Safeco review each of these leases before issuing bonds? I mean, did it go over every document and figure out this is appropriate or not appropriate? Yes, Your Honor. And that the testimony was that Safeco's underwriters would review the bonds and then give a thumbs-up. Well, if all that's true, then what's the difference if somebody went bankrupt some years ago if they're looking over each bond? Why does it matter? It's a very good question, Your Honor, and here's why. That crucial, and the record reflects this, that crucial to Safeco was the fact that it appeared on its face that underwriters met with these individuals, that they had created a good business model, that they had a system. They were going to continue to service the leases. They were going to continue to make the loans. They were going to continue to repossess office equipment. They were going to be deeply involved in running the business. If one knew that they couldn't even run their own lives, their own financial circumstances, that they had gone bankrupt, that would have been a real problem. Couldn't you have easily found out if they'd gone bankrupt by looking on Google or something? Well, that's one of the FDIC's arguments. And the jury instruction said that if the information was readily obtainable, then the jury should rule against or should return a verdict for the FDIC. But that's inconsistent with California law. When we're talking about a surety under California law, and I'll come to this because the second error relates to which law applied, there's a duty of utmost disclosure on the person seeking the surety because it's essentially a guarantee of payment. And so there is not an independent guarantee of payment not by the people that have the bad personal history, but by their lessees. And there is evidence that suggests that SAFCO's concern, the underwriter's concern, was principally with those lessees. From a credit risk perspective, I understand that. I haven't seen an argument with regard to misrepresentation there. FDIC's characterization, which I also understand, is that SAFCO really didn't care very much about the principles of CMC, didn't do even cursory examination, made its judgment with regard to the underwriting of the credit risk. It turned out to be a bad judgment. But that's why isn't that the case? Two things, Your Honor. If the Court goes back and looks at our second supplemental excerpts of record on pages 4 and 6, the SAFCO underwriter testified that they very much did care and that if they had known that these principles had these checkered business caps. It's a slightly different question. I mean, after the fact, I'd have been shocked if they said, no, we didn't give a damn. But more to the point, it wasn't a hard inquiry to make to look into the backgrounds of the principles. It wouldn't have been hard, I don't think, to discover this information. It plainly wasn't discovered. The only inference I can draw is it just didn't matter to them at the time. It didn't seem important. I think, Your Honor, I think the record reflects otherwise. It's a factual issue, though, I'll grant you, that the jury could have considered that as one aspect of determining whether reliance was reasonable. Under California law, which we contend applies, reasonable reliance is presumed and it would have been the FDIC's burden to rebut it. And under California law, I better get to this California law question so I can clarify why I think that applies, but there was a dual disclosure. If the CMC, via Mr. Anthony and its principles, withheld crucial information, under California law, the sureties are invalid and the bonds are invalid and the company can refuse to pay on that. I have to say in the big picture, this whole thing seems a little peculiar to me, because the actual, I'll call them insured because I can understand that, it's people like NetBank. They're the ones that aren't in this transaction. They're the ones that are looking to the surety to provide them protection if something goes south, and they're the ones left holding the bag by the theory that you're offering up. Why should we look at the transaction that way? Well, Your Honor, again, I think, first of all, NetBank was making very, you know, seemingly pretty risky investments. It expected 11 percent return on this. And one thing that the government says that Safeco was looking for high premiums. It was making 2 percent. But everybody was in this for the money, but NetBank had come into this with confidence that, well, we've got this surety bond here from Safeco and presumably others, and so our risk is less than it would otherwise seem to be. Well, it's an un – it is a different type of transaction, but that doesn't mean that if CMC defrauded Safeco, Safeco's remedies are out the window. And here, if I can just turn to the fraud argument, Your Honor, the district – this was another crucial error that skewed the trial. The district court applied Georgia's choice of contractual law rules because – and Nevada law applied as to the fraudulent inducement claim. That was clear error. There's no question that Georgia's choice of law rules apply here. The government agreed with that, said there's no room for doubt about that. Georgia's choice of law rules couldn't be clearer, that where there's fraudulent inducement as a defense to a contract, the Baxter case, if you're going to – if the Court wants to reread one case, the Georgia court of appeals decision in Baxter is dispositive here. In Georgia, fraudulent inducement is a tort, and you look to the law of the jurisdiction where the tort occurred, and here, that was California. That's where the misrepresentations were made, and Safeco was induced into signing the contract. When you look at California fraud law … Kennedy, what's the connection between inducement and having to do due diligence? I mean, is there – it seems like there's some relationship. Yeah. Your Honor, I guess that goes to reasonableness of reliance, and that's a factual question for the jury. All we're asking here is for there to be a trial where Mr. Anthony's knowledge isn't all imputed to Safeco, and that the jury get proper instructions under – under California law. And on that point, Your Honor, the district court affirmatively put the burden on Safeco to have done a reasonable investigation under Nevada law. California law is very clear on this, that there is no affirmative obligation to do an investigation to have a fraudulent inducement claim. So your question really puts your finger on it. California law would not make that connection. And then the second point is, under California law, there's an affirmative duty of disclosure here would have run to CMC to have disclosed everything that could have been relevant to the issuance of the bonds. And it didn't do that. And irrespective of arguments about lack of diligence on the part of the Safeco underwriters, the jury could have returned a verdict in favor of Safeco on this point. So the law really makes a big difference. And I do want to make the point that Safeco did due diligence. They went, they met with these people, they asked Anthony, who had been working with them, what he knew about them. They sat in their offices, reviewed the books, reviewed their system. But those are all issues for the jury once we have the correct legal principles. The other fundamental difference in California law is it imposes a clear – is it does not impose the clear and convincing evidence standard that Nevada law applies and that governed here. And that, again, made a huge difference. This Court's decisions in the Clem case, in the Sanders case, and in Gambini say that where the jury instruction is wrong and it added to the burden of proof or added an element to the claim, that is almost automatically prejudicial. And this was extremely prejudicial. Granted, Judge Adelman, the instructions that were given are very good for the FDIC under Nevada law, because they say unless you did an affirmative investigation and that's their main claim that Safeco didn't, that really gave them a road to a victory under the wrong law. And all I'm asking for is that Safeco get a chance to try this case, retry this case under the proper law, where Mr. Anthony's knowledge is not imputed in toto. That destroyed the claim, basically. And where California law in the area of surety and fraudulent inducement apply, and I think we would win under those circumstances, but it would be up to the jury. With that, I'd like to reserve the rest of my time for rebuttal. Roberts. You may. And we'll hear from the FDIC. Gunning, represented the FDIC. The district court properly instructed the jury, and if there are any alleged errors, they're harmless. But I'd like to start with the dispositive issues, which is 1823e. I've got to say, I'm just astonished at the way the FDIC has brought that issue up. Well, Your Honor, it's kind of late in the game, isn't it? Well, it would have been better earlier, Your Honor, but. So you're willing to let the case proceed and go through trial and everything and say, oh, by the way, never mind, and this stipulation we signed, which suggests that they're supposed to be able to go to trial in fraudulent inducement, that means something different than it appears to mean. You know, the defendants made an argument that this kind of Hail Mary suggests you don't have much confidence in the real issues on the case. And I've got to say, I share some of that feeling. Why should we pay attention to this issue coming through the door at the 11th hour? Well, because it's dispositive and you don't have to go march through all the other legal issues, we did not waive the. What did that stipulation mean? The stipulation was entered into because we were supposed to, there was going to be a trial on the intended obligee issue. If NetBank was the intended obligee, then there would be no fraudulent inducement on the part of SAFE, excuse me, on the part of us. So the ---- Kennedy, but if your reading of the statute is correct, you wouldn't have to deal with that issue, would you? Under 1823e, Your Honor? No, Your Honor. Under 1823e, the fraudulent inducement defense would go away. And we think that's appropriate here because ---- So why did the parties enter into the stipulation if, in fact, you're telling us it doesn't matter because under the statute the claim would go away anyway? They entered into this because they were going to have a trial on the fraudulent inducement defense which related to the intended obligee. If NetBank was the intended obligee, then there would have been no fraudulent inducement because they had no contact with SAFEco. The entity that did the fraudulent inducement was CMC. And at a previous MDL proceeding, the Court held two trials and they lost on that issue. So when this case came back from the MDL Court, it was set for trial for this intended obligee issue and also for the fraudulent inducement defense. The FDIC ---- By that time, had the FDIC been put in place as receiver? Yes. They had put they were in 19 ---- excuse me, in 2007, they were put in place. Okay. And then it was at the MDL for three years, and then it came back, and then it went to trial. So the FDIC just agreed to waive that defense in ---- and the result of waiving the intended obligee defense would be that they would be entitled, SAFEco would be entitled to raise the fraudulent inducement. And it is only in that context that we waived it, Your Honor. And on page 82 of our supplemental appendix, we ---- their trial counsel admitted that's what the waiver was about. But if your reading of the statute is correct, that would have all been academic, wouldn't it? Because by that time, FDIC was the receiver. That's correct, Your Honor. So why would anybody enter into a stipulation to remit the trial of an issue that's not going to matter because it's all academic? And why should we interpret the stipulation that way? I don't think the FDIC was focusing on it at that particular time, Your Honor. Well, then how did they not waive it? Because they sent a lot of parties and a lot of attorneys' fees for nothing? Or we should interpret the stipulation more broadly and suggest that for whatever reason the FDIC decided not to assert its defenses and we're going to let this issue go to trial. I've got to tell you, Doré doesn't seem very attractive to me. Okay. Well, Your Honor, then I'll move on to Doré B.  FDIC did not grant it. I'm not alone. You certainly tried to persuade my colleagues, but we think it is that the 1823E defense is appropriate. We didn't waive it. It was properly before the district court. The district court, listen to me. Don't tell me that the district court granted it. The district court so held your brief, says, that strikes me as another howler. The district court simply adopted what was in the memo given to it. And way back at the tail end of the memo given to it, there's mention of this issue. I have a hard time inferring from that that Judge Dawson decided, well, here's the winning issue, here's the key to the puzzle, I'm out of here based on this ground. Well, Your Honor, even if it wasn't a basis of his decision, it can provide an alternative basis for affirmance, because we did raise it. And even if it was for the first time on appeal, it's a legal issue that can be considered that does not require further development of the record. And we believe it should be considered in this particular case. On the imputation correct, that was the instruction was correct. A principal is presumed to know the facts the agent knows, even if they don't communicate them. SAFCO's proposed limitation wanted to limit it just to the scope of the authority of the agent to act, and that's contra to the law and the facts. We presented cases that the knowledge can be imputed even if the agent's authority is limited and it violates restrictions on his authority, unless the limitation is communicated. Well, let's take an extreme hypothetical, which isn't this case. Suppose Mr. Anthony served as an agent for SAFCO for entirely unrelated transactions, wasn't involved in the CMC transaction at all for SAFCO, was strictly involved for CMC. He's still SAFCO's agent, but in that case it would seem pretty clearly his knowledge would be outside the scope of his authority. Why wouldn't it be appropriate for that limitation to be imposed? I get your hypothetical correct. He was only working for CMC, Your Honor? With regard to this, these transactions. He worked for SAFCO on other, they issued surety bonds to banks for their employees' honesty and so forth. And so he did some work for SAFCO. He was at that moment an agent for SAFCO in entirely unrelated transactions. In my hypothetical, he did nothing for SAFCO with regard to CMC. He had this knowledge about CMC. And let's assume for the hypothetical the knowledge would have been material and SAFCO could credibly say that it never would have done this deal if it knew what Mr. Anthony knew. The question becomes, can Mr. Anthony's knowledge properly be imputed to SAFCO? Under the hypothetical I set where his work was entirely unrelated to CMC, the question is, what's your response to the question of whether his knowledge should properly be inferred, imputed to SAFCO? Well, if the limitations on what his authority was with SAFCO were not communicated to anybody or to the insurer or to a third party, it could be imputed to him. Because the cases we cite from California indicate that. That there's got to be a limit. They may have no idea he ever does anything for SAFCO. He's not holding himself out as SAFCO's agent for this transaction. You know, he's in the business. He does different kinds of insurance policies and he's doing some bank charities bonds, but nothing with this one. So nobody's really relying upon him. Well, SAFCO indicated they were relying upon him. They said he was their agent and they relied on him. Well, not in my hypothetical. In my hypothetical, he's not working. The point I'm trying to make here is the limitation proposed by defendants is not illogical. If he's working on something entirely separate, has nothing to do with CMC, it's not clear to me why his information should be imputed to SAFCO. Are you quarreling? And you're allowed to quarrel with him, but I'm saying do you disagree with that? Because what it leads to, it says I'm not trying to hide the ball. I'm not sure the instruction is inappropriate or, for that matter, all that bad for you, but they're trying to say, look, this is basic common law with regard to what you impute to a principal from an agent's knowledge, and I'm not sure that's wrong. But the cases say that you don't just limit it to the – you don't necessarily just limit it to the scope of an agent's authority if it's not communicated, Your Honor. I mean, in this particular case, there was no communication about the limits of his authority. The – the concealment defense is about that he didn't tell them about the bankruptcy and the consent order. And the critical time was April 28th, 1999, and that's when they agreed to enter into the lease bond program. And so prior to that time, CMC or anybody else did not really have any notice that Anthony wasn't their agent. And I think that this was under the O'Riordan case, you can be charged with knowledge that you acquire before you become – you are actually acting for a principal, if it's on your mind and you reasonably take – when you act on behalf of the principal, ultimately. Now, on the terms of the – that also in – I'd like to point out that Mr. Anthony, there was no instruction on adverse interest on behalf of Mr. Anthony, and they didn't put in any evidence that he was receiving money from both parties, CMC and O'Riordan. They didn't say, go. Now, on the Georgia choice of law, the – Mr. Corr properly applied the Nevada choice of law because of the particular provision was broad and encompassed the rights, obligations, and remedies. And here, seeking fraudulent inducement for a – to get a rescission was a remedy under Georgia law. SAFCO says it's a tort, not a contract remedy, but that's against the Supreme Court decision of Bullard in Georgia, which says that the tort applies a law at the place where the injury suffered, and that is – would be in Washington State, the State of Incorporation, and the headquarters. Now, he cites to the Baxter case that basically says that the – the tort occurs where the act or the misrepresentations were made, but is directly contra to the Supreme Court of Georgia and would not control. On the reasonable reliance, they're saying that they must have a – there was no need to do a reasonable investigation under California law that is contradicted by this Court's decision in Castengay, which was interpreted California law. And it says that a sophisticated party must investigate questionable representations. The Court found there as a matter of law that there was no justifiable reliance because there was no investigation, so there was no issue for the jury. Here, we had Mr. – Kennedy. Roberts. What was the question of a representation here? They were saying that they were – in this particular case or in the Castengay case? In this case. In this case, it was the SAFCO execs said that they were told that there was a 1 to 4 percent default rate on this lease bond program. But they did nothing to investigate or to verify the underlying numbers, and indeed, they were told that it was an estimate, a projection – excuse me, not a projection, but what they were shooting for. So under two bases, it was an estimate, and under California law, estimates are not an estimation. This is an issue you can help me on, because I had some trouble as I went through and there are lots of pieces here. Certainly, it didn't turn out that that was the default rate. At what point in time – but this was a new program, and so there wasn't a lot of history. At what point in time did actual performance contradict the overly optimistic business plan? Your Honor, it's difficult to tell, because what the default rate that they were talking about was something that you would do over the five-year term of the lease as to what the loss ratio was. By 2000, they were having problems, and the net bank got wind of it and, excuse me, SAFCO got wind of it, and they went and they did some audits and some investigations and found some problems with the system. But the bottom-line point is, Your Honor, SAFCO did nothing to look at the underlying numbers to what was underlying or what was going on. They admitted they did no investigation, and they basically just looked at how the program was working. And the program had been in existence for a year, so there would have been some leasing in particular and some statistics and some things of that nature available to look at. But they did nothing to try and look at it. Now, on the concealment defense, they the SAFCO cites Susumi Tomo and says that there's an absolute duty to disclose everything, but that only applies to Fidelity bonds. It does not apply to surety bonds, which we have here. And in any event, even under California law, there's no duty to disclose publicly available information which is within the fair and reasonable reach of the parties in this particular case. As you noted earlier, the bankruptcies and the consent decrees were part of public knowledge. Our witness testified that through a background check, you could have found out this information. They did not disagree that they couldn't have found it out. They didn't disagree that they could have done one. And then, in addition, the concealed information must be material under California law. And here, they didn't require an application from the CMC principals. They didn't admit it that they weren't interested. They said, you know, we weren't doing them for a credit check. They were just underwriting the credit lessee's and not MC's. So they admitted that it wasn't material to them in this particular case. So for the --- for these reasons, we feel that the district court did not abuse its discretion in denying the motion for retrial, and we request that the Court affirm this decision. Thank you, Your Honor. Roberts. Roberts. Thank you. Alito, let me start with the failure to the false statements regarding the default rate, because it's not – it's simply not true that the company did not investigate this. And this goes back to, I think, some of the earlier questions you asked me. The record is very clear that the company went into the office, reviewed spreadsheets, reviewed the data, asked probing questions about how could you have such a low default rate, did look at the data. It's absolutely clear they did. ER-246 talks about how they looked at the data that they – the company had. ER-298, Mr. Eckert was suspicious of the low default rates. They probed every which way to find out how this could be true and came away satisfied that the – that CMC had a process for quick repossession. They had a pool that they kept, a reserve pool, to stop defaults from occurring. And there was some historical data. The program had been going for at least a year. So the company did look into that. Ultimately, their assessment turned out to be incorrect. What is it about Mr. Anthony's knowledge that spoke to that? Well, Mr. Anthony did not report to have knowledge on that. It wasn't in that. That's correct. But the CMC principals engaged in fraudulent misstatements when they told – so this is really a separate part of the fraud that has nothing to do with Mr. Anthony. He didn't know that. The CMC principals did know that, and they looked Safeco underwriters in the eye and said 1 to 2 percent, and Safeco said, that doesn't sound right, let's see the data. And they looked at it in the offices of the company. With respect to the key argument that Ms. Gunning is making on – it all comes down to this on the question of imputed knowledge, as far as from what I heard. Ms. Gunning contends that it all depends on whether the limits on authority were communicated to the other side. That's, number one, it's wrong. The FDIC is citing cases that involve apparent authority to bind the company, not imputed knowledge, totally different issue. But here, CMC knew the limits on the authority. If the Court takes a look at, again, our supplemental – second supplemental excerpts of record, pages 9 to 10, Mr. Anthony describes how the CMC representative would be in the room, the Safeco representative would be in the room, and Mr. Anthony would sit there with his pen and the Safeco representative would say, you can approve these, you can sign these, you can't sign these. They knew he had very limited authority. The record is undisputed on that. So even if that was the rule, the – they – CMC had that knowledge, and at a bare minimum, that could have been part of the jury instruction, but the jury instruction gave the jury carte blanche to assume that everything Mr. Anthony knew was imputed to Safeco, and that was simply wrong. My time is up. Thank you very much. Roberts. Thank both counsel for your arguments. The case just argued is submitted. That concludes the arguments for today, and we're adjourned. Thank you.
judges: Adelman, Noonan, Clifton